The next case today is Selchuk Karamanoglu versus the Town of Yarmouth et al, appeal number 20-2015. Attorney Smith, please introduce yourself for the record and proceed with your argument. Good morning and may it please the court. Tyler Smith for the appellant, Selchuk Karamanoglu. Judge Thompson, may I please reserve three minutes for rebuttal time? Yes, thank you. Probable cause is a practical standard that looks to the totality of the circumstances. So in a case like this, where the fact suggests an issue of an apparent justification, an arrest is unreasonable and hence unconstitutional unless the police have probable cause to conclude that the arrestee's conduct was not justified. Main law provides that a person may use a reasonable degree of non-deadly force in self-defense and also that a person may use non-deadly force to the extent they believe it is necessary to terminate a criminal trespass. Facts known to Officer Andresen in this case established that Mr. Karamanoglu used a reasonable degree of non-deadly force to defend himself and his home. As the Supreme Court has found, Ms. Heikkinen described herself as the more aggressive party, that she assaulted Mr. Karamanoglu in a jealous rage, that she refused to leave the home after being ordered to get out, that she continued using force throughout the encounter, and that she was fighting back not because she was trying to defend herself or assert any rights as a tenant, but because she wanted Mr. Karamanoglu to leave. The District Court erred by discounting this context when it focused in on two facts, namely the Heikkinen statement that Mr. Karamanoglu had grabbed her by the neck, and then also the statement by Ms. Heikkinen that Mr. Karamanoglu had pushed her down the steps into the garage. Now beginning with the neck grab, Officer Andresen would have had to speculate that the so-called neck grab was an unreasonable use of force in the context of the altercation, and that's simply because he didn't know anything about it. The only facts that Officer Andresen knew were that Ms. Heikkinen didn't have difficulty breathing, and that it happened at some point during an escalating ongoing domestic incident. In short, he didn't know the when, the why, the what, or the how of how the neck grab occurred, and it would have been speculative for him to assume that the neck grab was done in a way that was disproportional to the force being used by Ms. Heikkinen. With the neck grab, didn't the officer say that there was visible signs on her neck, reddening of her neck? What he said was that her face and neck area were red and had blotchy spots on it. So why would it be unreasonable for him to conclude that your client had choked her and that that level of force was unreasonable, even under the circumstances as you described? Well, I don't believe that her neck and face area being red and blotchy would itself be indicative that he had choked her, particularly when you look at the larger context. But it could be. We hear that in court all the time, that there's evidence of choking, and the evidence of choking usually is reddened area of the neck. Well, first of all, he also asked her specifically if she had any difficulty breathing. She said no. He didn't ask her any questions about whether he had squeezed her neck or anything about the neck grab, so it would have essentially required him to speculate. Now, to be fair, she, of course, did have an abrasion on her neck, but there were no facts establishing how that actually happened, and Andreessen didn't ask any questions about it. I'm sorry, Mr. Smith, to interrupt you, but I would like to prescind a little bit from the actual facts here and ask a hypothetical. I hope you don't fight the hypothetical, because it will take up your time and it won't answer my question. But it's a hypothetical that plays off what Judge Thompson just asked. I want you to assume that there was probable cause on both sides. It was equipoise. That is, it could have been your client, it could have been her, who was the predominant aggressor here. If it's jump ball like that, then do we just simply defer to the findings of first the officer and then the district judge, or is there some way that we can decide whether it's jump ball that the Court of Appeals will make that determination? I hope I'm following the question right, I mean, if there is probable cause that my client's use of force was unreasonable, then that would be fatal across the board to his case. I'm posing the question in which there's probable cause to believe both. That is, that she was the aggressor or your client was the aggressor. And a choice is made by first the officer on the scene and then by the district judge that it's reasonable to have chosen one over the other. Is there any standard that we would apply that would be different from other than essentially recognizing the discretion that's exercised by people under those circumstances? Well, I think in those circumstances, you would make a de novo review of the raw facts known to the officer. So the Court of Appeals would be doing the fact finding with respect to probable cause. Is that the principle that you'd have us adopt? No, Your Honor. The raw facts as known to the officer are an issue of fact on summary judgment. That's why I keep interrupting, but I want to keep you on point to understand the implications of what you're saying. And we'll go back, I'm sure, to the raw facts, but assume that they can point equally to either side. What happens then, and as I understand it, your argument is that then there should be de novo review, but if your client is adversely affected, there should be de novo review by the Court of Appeals. Right, there's a de novo review of the raw facts to determine if there was probable cause to believe that Mr. Caramadolu had used an unreasonable degree of force. That's something that this Court would review de novo. Of course, if there are issues of what the facts were that were known to Officer Andreessen, those would have to be decided by a fact finder. Circling back to the dialogue with Judge Thompson, the final point I wanted to make too on the neck grab was that as far as Andreessen was aware, and he conceded this at his deposition, it could have just as easily been that Mr. Caramadolu's hand slipped up to Ms. Heikkinen's while he was trying to defend her blows, or that he was trying to stiff arm her to protect himself from being struck while she was attacking him. The point there is that ultimately, Officer Andreessen would have had to speculate to conclude that the neck grab was an unreasonable use of force given the limited information that he had. The next topic that the District Court looked at was this issue of residency, so given the time, I thought I would shift there. Before you shift to that, I was struck more by the testimony. There's evidence that the officer was informed that your client had pushed Heikkinen down the steps onto the garage floor where she hurt her ribs to some extent. If that's correct, could a reasonable officer conclude that notwithstanding the criminal trespass, that was an unreasonable use of force to achieve her removal from the premises? I don't believe so, Your Honor, not in these circumstances, because we have an ongoing incident where they make their way from the bedroom to the entryway to the garage. Ms. Heikkinen is refusing to leave the entire way. She's pushing back. She's assaulting Mr. Karamandalu, and when they reach the doorway, he again tells her to get out. She says no. According to her statement, she becomes even more frustrated, and then she pushes him. So at that point, under Maine law, Mr. Karamandalu was entitled to use any amount of non-deadly force that he reasonably believed necessary to terminate her criminal trespass. You're saying he could reasonably push her down the steps into the concrete floor of the... I think that's what you have to say, is that we need to find that no reasonable officer could think that pushing someone down the steps onto a concrete floor was an unreasonable use of force. I know that is the argument, yes. Under these specific circumstances, of course, if you take that kind of fact in different circumstances or in isolation, an officer's determination could be different. If she was voluntarily leaving, of course, that would probably be an unreasonable use of force, but not in these circumstances, where we're viewing really with 20-20 hindsight decisions that Mr. Karamandalu is making in the midst of an ongoing trespass, where he's being assaulted. You're calling it an ongoing trespass, but she entered with the garage opener, so she didn't break and enter. That's right, and we've never taken the position that her entry itself was unlawful or a burglary. However, she did become a trespasser when Mr. Karamandalu told her to get out of the residence, and at that point, because she was not leaving the residence and she was remaining, she was a trespasser. What the officer knew is that she entered with the garage opener, and that according to her, she stayed there on the weekends. That's right, and again, we're not saying that her entry was unlawful. I think you're getting to the issue of residency and whether Officer Andresen could have concluded that she actually lived at the residence, and Ms. Heikkinen's statement really established that she was a non-resident of 90 Cornfield Point. When you look at the way she described her relationship to the residence, she talked about going into Mr. Karamandalu's bedroom, not our bedroom as one would if she were cohabitating with him. She qualified that she entered without his knowledge, which would be an unusual way of describing returning home if you actually lived there. She called it Selchuk's house. She didn't say anything to Officer Andresen about having to return to the residence after the altercation, and again, she distinguished between living in Auburn and staying on the weekends at Mr. Karamandalu's house. Now, the other fact that plays into that question was the BMV driver response, so I expect that my colleague will be discussing that, but the fact that does not contradict the information that Ms. Heikkinen provided, particularly where she described having an on-again, off-again relationship with Mr. Karamandalu. So all the registration says is that at some earlier point in time, she had registered her motor vehicle to 90 Cornfield Point, not that she actually lived there on June 15th of 2018. Thank you. Thank you. Any other questions? Okay, thank you. Thank you, Mr. Smith. At this time, you can mute your audio and video, and Attorney Park, if you could unmute and introduce yourself on the record. Good morning. Kasia Park for the appellees. May it please the court. Plaintiff repeatedly tries to minimize what he refers to in his brief as the alleged neck grab, but it's undisputed here that plaintiff grabbed Rose by the neck, and it's undisputed that Rose described that to Officer Andresen. There are also photographs in the record at Appendix 197-198. May I pause with respect to the photographs? Those photographs were taken after the next day, is that correct? No, there's two sets of photographs in the record. The photographs of Rose Heikkinen at Appendix 197-198 were taken by Officer Andresen the night of the incident prior to plaintiff's arrest. Are those the only photographs that you're asking us to look at? That's correct, Your Honor. Okay, you're not asking us to look at the ones the next day with contusions. The other photographs I believe you're referring to are the ones taken by the plaintiff. The only photographs that are material and probably before the court are the ones that Officer Andresen took, and those demonstrate that there are visible marks on Rose's neck and her throat area. And, you know, plaintiff disputes whether or not Rose described exactly what happened, but it's undisputed that she told Officer Andresen that plaintiff grabbed her by the neck. And it's reasonable, it's objectively reasonable for an officer to infer that that means he grabbed her by the neck and with enough force to leave a visible mark. The fact that he doesn't know exactly at the precise moment it occurred is not determinative of whether it could be considered. Isn't the record, though, when you read her statement in context, it's clear she's talking about a process where he's trying to force her out of the house and pushing out of the house. She had no trouble breathing. It seems to paint a picture of him trying to push her out rather than grab her and throttle her or harm her in any way. Well, Your Honor, I think she does describe it as sort of a scuffle ensuing. However, that doesn't undermine the seriousness of the fact that plaintiff grabbed her with enough force to leave these visible marks on her neck. So while she did admit to Officer Andresen that she hit him on the chest first, it was reasonable for him to conclude, for Officer Andresen to conclude, that the response of grabbing her by the neck escalated the violence and was not just a reasonable attempt to defend himself or the residents. Let's assume that it was a criminal trespass once he told her to leave and she didn't leave. It seems pretty clear she was engaged in a criminal assault. Didn't he have a right to use force to push her out of the house under Maine law? Assuming the facts as you stated, he does have a right to defend himself or defend his home. My question was, didn't he have a right to use a reasonable amount of force to push her out of the house? Well, Your Honor, he could reasonably use a reasonable amount of force to terminate the to admit that he could use a reasonable amount of force to push her out of the house. I mean, we're talking about a statute that allows the use of force. Force to me sounds like pushing someone out of the house. It doesn't sound like throttling them in the bedroom. Right. And I think there's a difference between pushing someone out of the house and pushing someone down the stairs onto the concrete floor, which is what Rose told Officer Andresen occurred here. So I think that even if we assume... How many stairs are we talking about? I don't believe, Your Honor, that it's in the record as to how many stairs precisely, but it is in the record that it was a concrete floor that she was pushed down the stairs and that's when she believed she hurt her ribs. Can I follow up on these two questions? Let's just assume that the only fact is pushing her down the stairs onto the concrete floor. Would that be enough for the officer to decide that there was probable cause here for her to be the predominant aggressor? Yes. Yes, Your Honor. She indicated that she pushed and hit a plaintiff. That's not my question, I don't think. It is what force was used by the defendant under these circumstances. I'm asking you to consider that only the pushing down the stairs, is that sufficient? Or apropos of the question that Judge Kayada was forced different from strangling someone in the bedroom. Just use that. Is that enough? Yes, Your Honor. That is sufficient here. What force would be reasonable to get somebody out of your house? Well, Your Honor, first of all, I think the inquiry here is whether it was objectively reasonable for Officer Andresen to conclude that probable cause existed, and that the law does not require him to fully investigate or determine whether or not the defense would be applicable here to a criminal prosecution. So, based on the totality of the circumstances and the information known to Officer Andresen, and if we limit that to pushing Rose down the stairs onto the concrete floor, as Your Honors have indicated, that alone is enough to support probable cause for domestic violence. But if you have a main law, which, as you say, allows for reasonable defense of self and reasonable defense of home, what does that mean? When an officer is considering charging, how does he factor main law into that decision? Well, Your Honor, he's not considering charging. He's considering probable cause, whether or not there was a substantial chance that plaintiff committed a domestic violence assault. And here, while he is considering all of the circumstances, he was not required to determine that plaintiff used only a reasonable amount of force based on all of the information available to him. It was objectively reasonable, based on Rose's injuries that are in the record and also her description of events, that even if she was trespassing, even if she was a criminal trespasser and plaintiff was only trying to terminate that criminal trespass, the amount of force used was unreasonable. And even if he was mistaken as to that, he would be entitled to qualified immunity. Going back to the question about the jump ball situation here, probable cause is at the very least... The question of qualified immunity is not before us. The question, truly, the question is probable cause. The court hasn't gotten to qualified immunity. It's not pressed on us, I don't believe, any more than Monell is. They may be the next steps in this process, but they're not here now, are they? My understanding is that plaintiff is appealing both determinations. The district court ruled that there was probable cause for the arrest, but in the alternative, at the very least, that there was qualified immunity because probable cause was arguable. And so I would submit to the court that even if Officer Andreessen mistakenly concluded, based on the information known to him, that plaintiff used an unreasonable amount of force, at the very least, probable cause was arguable. And any mistake that he might have made was reasonable under these circumstances. And based on the case law, particularly Holder, he would be entitled to qualified immunity under these circumstances. I just want to briefly touch on the residency piece of this for purposes of the foregoing questions. I was assuming that she was a trespasser here, but it was a reasonable for Andreessen to conclude that she had a right to be at the residence. As mentioned by the court earlier, she had the garage door opener. She was at 90 Cornfield Point earlier in the evening, returned home, and she entered while he was sleeping. When she woke him up to find his phone, he didn't say, get out. He said, go find it yourself. And based on that, including the BMV record showing her legal residence as 90 Cornfield Point, it was reasonable for Officer Andreessen to conclude that she wasn't a trespasser and had a right to be there, or at the very least, hadn't broken in, as is implied by some of the arguments in the plaintiff's brief. Plaintiff is essentially arguing that because he had a potential defense to prosecution, Officer Andreessen was required to accept his version of events, and that is not the correct probable cause analysis. Well, I did not read their brief. I read their brief as saying they're accepting Andreessen's version of events as related to him by Heineken, and they're simply saying that based on that, she was a criminal trespasser and no person, could find that the force used was unreasonable given her resistance. How else was he to get her out of the house? But on the facts that I just explained, Your Honor, I think that it was reasonable for Officer Andreessen to believe that she wasn't a trespasser. And again, even if he was mistaken as to what her actual legal residence was, or the property rights, again, any mistake on those points is objectively reasonable here and arguable, and therefore, he would be entitled to qualified immunity. Remember, the domestic violence assault requires the definition of family and household members includes sexual partners, and it's undisputed here that Rose told Officer Andreessen that her and plaintiff were sexual partners or formerly sexual partners. And so he had that information as well. And so that met the statutory definition of family or household members for the domestic violence assault. So certainly you're not saying that a sexual relationship equates with a legal entitlement to be in a place. What facts are you pointing to that would allow the officer to reasonably conclude that she had a legal entitlement to remain on the property without permission, as opposed to she was a guest who was permitted to frequently be on the property? Well, Your Honor, first, I would submit that, you know, officers are not required to be the arbitrators of property or tenancy rights. But the facts that I'm relying on is, first of all, that her license and registration showed her legal residency as 90 Cornfield Point. She had the garage door opener in her vehicle. She was there earlier in the evening, left, and then came back. And then once she entered, again, he didn't say, get out. He said, find the phone yourself. That was his first reaction. So based on all of that information, it was reasonable for Officer Andreessen to conclude that she had a right to be there, or at least was not a criminal trespasser. Just briefly, I would like to turn to the municipal liability claim unless there are further questions about the Fourth Amendment. There is this one question for me on the qualified immunity because it's step by step. Isn't qualified immunity in this circumstance conflated with the original determination about probable cause? That is, what would an objectively reasonable police officer under these circumstances have understood? I'm not sure that they're distinguishable. Now looking more carefully at Judge Rich's decision, I see the matter is more fully developed as an alternative, but it doesn't seem that there are any different choices. Your Honor, respectfully, I would submit that there is a difference in the standard because first, for probable cause, we look at the information known to the officer. But on the Judge Rich put it, then the officer is entitled to qualified immunity. So there is a bit of a distinction in the analysis. Okay, and we don't get to that until we don't get to Monell until we get over those two. I interrupted you when you were going to tell us about Monell. Well, Your Honor, Judge Thompson, may I briefly address the municipal liability claim? Yes. Okay, I just don't want to take up my time. So just briefly, with respect to the municipal liability, correct, if there is a finding of probable cause, then we don't even need to reach that claim. And just briefly, Plaintiff is recasting his arguments with respect to the municipal liability claim here. The policy is not unconstitutional on its face. It does not direct officers to arrest people that are merely defending their homes. That is not in the notice that the policy could potentially lead to officers not considering potential defenses to probable cause. So with that, I will rest on my brief unless there's further questions. Thank you. Thank you, Attorney Park. At this time, if you could please mute your audio and your video. And Attorney Smith, if you could please unmute your audio and video and reintroduce yourself on the record before you proceed. Good morning, Tyler Smith for Celsiac Caramontaloo. Thank you, Your Honor. Your Honor, so just to go over a few points, the abrasion to Ms. Heikkinen's neck, the injury, it's depicted at page 198 of the appendix. And the key factor here is that came from or how it occurred, beyond the fact that whatever the neck grab was, it apparently wasn't with enough force to restrict Ms. Heikkinen's breathing. With regard to the issue of Ms. Heikkinen being pushed through the garage door down the steps, once again, I pose the question, I think Judge Thompson touched on it in a question that I don't think was fully answered, of what was Mr. Caramontaloo to do at that point? Ms. Heikkinen wasn't just refusing to leave at that point when they were at the garage door and he demanded that she leave. She didn't just say no, she assaulted him again and pushed him out of frustration. And regarding the number of steps, I think it's also important at least to be cognizant of the fact that she described it as being pushed down the steps into the garage, which certainly doesn't imply that it was a flight of stairs or anything like that. And that Officer Andreessen already made his arrest decision before he even went to Mr. Caramontaloo's home. Judge Thompson, may I just interrupt on that issue? I want to be clear. Are you suggesting that the investigation was inadequate? Or are you suggesting that his evaluation of the investigation was inadequate? I think I'm suggesting both. I mean, this court then asked for the first part, how is it inadequate? He talked to both of the people who were involved. He did the basics of investigation. There's a timeliness issue involved. So how was the investigation itself inadequate? Well, one of the bases that are at least being argued here is the neck grab. He didn't ask really any questions about that beyond one question, which yielded exculpatory information. But that has to do with the particulars of the neck grab and what that means. It doesn't have to do with whether or not he inquired about a neck grab. Well, I think as far as the adequacy of the investigation, it is relevant that he didn't ask any questions about the neck grab. And the same thing with being pushed down the stairs. He's taking an inculpatory inference from that, yet he didn't ask any specific questions. So we were basically just left with misheikening statements. As I understand the law from this court and elsewhere, although a police officer isn't under a standing obligation to conduct investigations or to investigate all potential defenses to a crime, they are under an obligation to refrain from conducting an arrest until they have probable cause that a crime has been committed. And at this point, by the time that Officer Andreesen had made his way... You may finish your answer. By the time he's made his way to the Caramondaloo residence, viewing the facts in the totality, he lacked probable cause to believe that Mr. Andreesen was not justified. Anything else, Counselor? Anything else? No, not at all. Thank you. That concludes arguments in this case. Attorney Smith and Attorney Park, you should disconnect from the hearing at this time.